## AMERICAN CHEMICAL PAINT CO. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 5075.

Circuit Court of Appeals, Third Circuit.
Aug. 11, 1933.

James S. Y. Ivins, of Washington, D. C. (Percy W. Phillips and Kingman Brewster, both of Washington, D. C., of counsel), for petitioner.

Wm. Cutler Thompson, of Washington, D. C., and Sewall Key and John MacC. Hudson, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Arthur Carnduff, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

The just determination of this tax case depends on the value of a novel, useful, and

inventive disclosure made by Feidt, to whom patent No. 1,119,781 issued therefor. This patent is, by mesne assignments, owned by the American Chemical Paint Company, the taxpayer, and for which it paid all of its common stock of $450,000, and $5,000 of its $7,-500 preferred stock. In the taxable year of 1927 the company made a profit in the working of such patent and royalties thereon of $628,113.53. Its contention herein is that it should be allowed for the yearly exhaustion of the patent on the basis that the patent was worth such $457,000, for which it paid its stock as aforesaid. The Commissioner refused to give the patent any value whatever, and the Board of Tax Appeals approved of the Commissioner's action. Whereupon this appeal was taken.

This patent, its place in the automobile industry, its almost unbelievable work, in averting the abandonment of steel in the construction of automobile bodies (to say nothing of the use of steel in passenger cars for railroads and trolley lines), the ruin of companies engaged in this, the greatest industry in American commerce, all unite to make clear beyond question that in the history of patents there is nowhere shown the like of this patent, in saving from destruction a great steel industry, as this simple, novel, effective process of Feidt. A study of the case of American Chemical Paint Company v. C. R. Wilson Body Co. (D. C.) reported in 298 F. 310, the record of which was given in evidence in this case, and an apprehension of the significance of that case is necessary to a just estimate of the worth of Feidt's patent and the part it played not only in producing for the government income paying taxes by its owners, but also in the incomes of practically all the automobile manufacturers of the country and in the incomes of the stockholders of these companies. If such be the case, we can see we are face to face with a patent whose real value to the country is beyond computation, for as the Board of Tax Appeals state in their opinion: "The original process, which was a very simple and inexpensive one to use, was still in use in the taxable year 1927 at which time practically every automobile manufactured in the United States was being subjected to this process."

About 1912, when the making of the bodies of automobiles out of steel was begun, it was soon found that, no matter what care was taken in painting such steel bodies, the paint came off in spots and cracks. The situation is described by the experienced patent judge in his opinion in that case. The great steel body industry in automobiles harked

back to verify the truism uttered two thousand years before, that "rust doth corrupt." In other words, it was found that, no matter what care was taken, what ingredients were used, painted steel generated rust of the steel underneath the paint, which latter then peeled off. In his opinion the trial judge says: "Steel, when in the presence of moisture and either carbonic acid gas, hydrochloric acid, or any one of many salts, is gradually converted into hydrated ferric oxide or rust. Paint will protect it from oxygen, water, and carbonic acid gas; but, if the surface of the steel is not free from or rendered immune to rust stimulants before the paint is applied, rusting may continue beneath the paint, and cause the paint to blister and come off." He then tells how anti-rust stimulants were sought for, but none proved effective: "Alcohol, gasoline, lemon juice, and like matters were applied to the bodies before painting, and the bodies were also brightly burnished, but all to no avail. The paint still blistered and came off. The painted bodies put upon the market were returned to the painters in carloads, and later, as the output increased, in trainloads. The painters were in distress. They lost money rapidly. Many were on the verge of failure." This commercially appalling situation was changed by Feidt, by an invention as simple as it was novel and effectual, which was, in the language of his process claim: "The method of preparing steel for painting, which consists in treating it with an admixture of alcohol and phosphoric acid, which will dissolve oil and act on the steel." By using this process as an anti-rust stimulant between the same paint and the same steel—which before generated rust—Feidt banished rust from the steel body automobile art. To again quote from the judge's opinion: "The cause of the trouble was removed. The paint stayed on. The remedy was a complete success."

Feidt's invention was made in the fall of 1913. A witness testified that "by January 1st, 1914 more than one hundred automobiles had been thoroughly treated with this formula and I would say more than 200." By February 5th following, he testified, "I saw them applied at Hale & Kilbourn" (large car building works). "I saw twenty processed and knew before that that they had processed quite a few that had been returned because of defects in the paint." Taking into consideration the fact that Feidt's process had been applied to this large number of cars, and bearing in mind, as the proof is, that "checking or flaking of the paint when applied directly on the steel will take place in about two

weeks," it is clear that the success and the large monetary value of Feidt's remarkable process had been proved at this early date. Had it been applied to a single car, the success might have been problematic, but, when applied to two hundred, and then to a number of others at such a works as Hale & Kilbourn, its worth, operatively and financially, passed from hope to realized certainty. When firms were being forced out of business by the unconquerable rust, where others were forced into bankruptcy, where cars, not singly, but in trainloads, were being shipped back to factories, and when it was shown that rust on steel was overcome by Feidt, no business world can close its eyes to the demonstrated worth—commercially and financially—of this novel and effective remedy at the basic date of February, 1914. It is quite clear that the commercial working of this patent required no outlay for factory, machinery, and equipment. The simple mixture could be made by one licensed to use the Feidt process or could be furnished by the patent owner and sold at $2.50 a gallon, with a profit of 60 cents. In our experience with patents, we have encountered no patent where the working efficiency of a process, simplicity and cheapness of product, and so vast a field for its use by such a mammoth industry, helpless without its use, compared with the Feidt situation.

In view of these proven facts, we feel the testimony of a witness, whose competency was adjudged by the Board on objection thereto, and who was experienced in the flotation of inventions and thoroughly familiar with the then situation, that the purchase of the patent by the company for $450,000, payable in entire common stock of that amount and of its preferred stock, was a just price, is persuasive. In arriving at this estimate of value, due regard by him was had to the difficulties to be met with infringers, etc. In that regard he testified:

"Well, I considered the number of steel bodies that were manufactured from the beginning of 1912 and the enormous increase in the number of those bodies over the years.

I did not foresee the tremendous increase in automotive transportation that we have witnessed. I took the profit that we could make at $2.50 per gallon, a net profit of 20 cents a body, and I figured that we would do at least 300,000 bodies a year because that was the production of steel bodies in 1912 and it increased 100,000 in 1913 and I thought there would be, certainly, that normal rate of increase, of say one-third, or if not one-third at least 100,000. On the basis of that we had $60,000 a year and in seventeen years a man would certainly contemplate in buying the patent that he was going to make a profit of over $1,000,000. So I think I was very conservative when I put in a value which, since that time, we have earned in one year.

"We were certain in February 1914 that the patents would be granted us on this formula. There were no interferences cited at all in the application. We knew in 1914 that automobile bodies would be made of steel; there were 300,000 of them in 1912. In the high-priced cars some bodies were made of aluminum. You can use this formula on aluminum. * * *

"In 1919 our earnings were $42,000 before deducting patent depreciation. I do not recall the 1920 earnings without my memorandum. The subsequent earnings of the patent abundantly justified the expectations which I had for them at the time I fixed the $450,000 for the valuation of the invention, at the time it was acquired. In fact, I was too conservative."

As against this testimony, the government offered no testimony. In its opinion the Board says: "We have no special knowledge of this patent application in 1914 aside from what we have learned from the record, nor private knowledge of any particular facts material to the decision of the case."

In view of these facts, we are of opinion the taxing authorities were in error. Its decree is vacated, and the record returned, with direction to allow the claim of the taxpayer to deduct $25,555.12 as a reasonable allowance for the depreciation, exhaustion, or amortization of the patent No. 1,109,670.