Century Tank Manufacturing Co. v. Commissioner.
Century Tank Mfg. Co. v. Commissioner
Docket No. 61878.
United States Tax Court
T.C. Memo 1959-95; 1959 Tax Ct. Memo LEXIS 152; 18 T.C.M. (CCH) 430; T.C.M. (RIA) 59095; May 13, 1959
Roger K. Powell, Esq., 17 South High Street, Columbus, O., for the petitioner. Bart A. Brown, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax for the fiscal years ended on June 30, in 1952 and 1953 in the respective amounts of $1,581.19 and $2,325.58. The petitioner alleges as errors the disallowance of deductions claimed as depreciation on patents in such years and in the following fiscal year. The year ended in 1954 is involved by reason of a net operating loss which pursuant to section 172 of the Internal Revenue Code of 1954 may be carried back to the earlier years. The returns of the taxpayer were filed with the collector or director of internal revenue at Columbus, Ohio. *153 Findings of Fact The petitioner is a corporation organized on June 28, 1948, under the laws of Ohio, with its principal office in Columbus, Ohio. All corporate stock was originally issued to Maurel G. Burwell, who at all pertinent times has been president of the petitioner. The stock has at all times been owned by Burwell or members of his family. Prior to June 28, 1948, Burwell conducted a sole proprietorship, known as Century Manufacturing Company, engaged in the manufacture and sale of hot water heaters. Burwell was an inventor of hot water heating apparatus. Upon the organization of the petitioner the directors adopted the following resolution: "WHEREAS, M. G. Burwell, who has been doing business as an individual under the trade name of Century Manufacturing Company, is the owner of the following described property and assets, which have a book value, as shown by the books of the said M. G. Burwell, of the amounts hereinafter set forth: "Cash in bank and on hand
$ 1,619.20
Inventory (at approximate cost)
8,394.73
Advance payments - Inventory
3,298.37
Prepaid Insurance
91.85
Machinery, Equipment, Furni-
ture and Fixtures
4,439.09
Advances for proposed cor-
poration
310.00
Total
$18,153.24
*154 "AND, WHEREAS, the said M. G. Burwell has offered to sell and convey said property and assets plus $846.76 to this corporation for four hundred (400) shares of the capital stock of this corporation and the assumption by this corporation of an obligation of the said M. G. Burwell in the sum of Seven Thousand Dollars ($7,000.00) to the Canal Winchester Bank; and "WHEREAS, the directors of this corporation are of the opinion that said offer should be accepted and that said property and assets are reasonably and fairly worth said sum of $18,153.24 and should be purchased by this corporation; and "WHEREAS, the said M. G. Burwell has offered and agreed to assign to this corporation all letters patent and copyrights and amendments thereto pertaining to hot water heaters now held or applied for by the said M. G. Burwell, including any rights arising from applications heretofore rejected, to the full end of the term for which such letters patent or copyrights are or may be granted, including re-issues, renewals and extensions. "NOW, THEREFORE, BE IT RESOLVED, That this corporation purchase said property and assets from the said M. G. Burwell for $18,153.24, said purchase price to be *155 paid by the issuance by the corporation to the said M. G. Burwell, or his nominees, of four hundred (400) shares of the fully paid and non-assessable common stock of this corporation and the assumption by this corporation of the obligation of the said M. G. Burwell to the Canal Winchester Bank in the sum of Seven Thousand Dollars ($7,000.00), the balance of $846.76 to be paid by the said M. G. Burwell to this corporation as soon as said obligation of Seven Thousand Dollars ($7,000.00) is paid by the corporation; and "BE IT FURTHER RESOLVED, That in further consideration for said sale and transfer of said assets and assignment of letters patent and copyrights issued to, applied for by or that may be issued (or applied for by) the said M. G. Burwell this corporation shall, and it hereby does, assume any and all liabilities or obligations of the said M. G. Burwell, doing business as Century Manufacturing Company, for excise taxes or resulting from warranties or guaranties of tanks heretofore sold by the said M. G. Burwell." In March 1951 Burwell applied for two patents, which he subsequently received, Patent Number 2641218, issued June 9, 1953, upon application number 218628, and *156 Patent Number 2700622, issued January 25, 1955, upon application number 216174. The latter patent was reissued as R.E. No. 24187. On or about February 4, 1952, the petitioner entered into a contract with Burwell, which provided: "WHEREAS, MAUREL G. BURWELL, of Columbus, Ohio, did obtain Letters Patents of the United States as follows: "2,522,091 dated September 12, 1950 for LIQUID HEATING APPARATUS; and "2,549,755 dated April 24, 1951 for BURNER BASES FOR HOT-WATER TANKS; and "2,559,110 dated July 3, 1951 for WATER HEATERS AND BURNER HOUSINGS THEREFOR; and "WHEREAS, said Maurel G. Burwell has made application for Letters Patents of the United States as follows: "Serial No. 216,174 filed March 17, 1951 for AGGREGATE-LINED CORROSION-RESISTANT HOT WATER TANK AND METHOD FOR PRODUCING SAME; and "Serial No. 218,628 filed March 31, 1951 for APPARATUS FOR APPLYING CEMENTITIOUS LININGS TO INNER WALL SURFACES OF LIQUID-HOLDING RECEPTACLES; and "WHEREAS, CENTURY TANK MANUFACTURING COMPANY, an Ohio corporation, of Columbus, Ohio, is desirous of acquiring the entire right, title and interest in and to said Letters Patents and applications for Letters Patents; and "WHEREAS, Century *157 Tank Manufacturing Company did provide part of the expense of development of the processes for which Letters Patents have been applied; and "WHEREAS, at the time of incorporating the said Century Tank Manufacturing Company, Maurel G. Burwell did agree to assign the first two Letters Patents which at said date had only been applied for; "NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is agreed as follows: "1. Maurel G. Burwell agrees to transfer the aforesaid Letters Patents and applications for Letters Patents to the Century Tank Manufacturing Company by means of proper assignment to be filed with the Commissioner of Patents in Washington, D.C.
"2. Century Tank Manufacturing Company agrees that after the assignment of the aforesaid Letters Patents and applications for Letters Patents has been completed that it will release said Maurel G. Burwell from any obligations to reimburse said Century Tank Manufacturing Company for expenses incurred in developing the aforesaid Letters Patents and applications for Letters Patents. "3. Century Tank Manufacturing Company agrees that should any third party, or parties, wish to be licensed by said Century *158 Tank Manufacturing Company to manufacture and sell under the aforesaid Letters Patents and applications for Letters Patents, such licensing may be done only with the consent of Maurel G. Burwell and on the condition that 50% of the net royalties received from licensing any third party, or parties, as aforesaid, shall be paid to said Maurel G. Burwell." In June 1952, the petitioner entered into contracts with Garfield Manufacturing Company of Cleveland, Ohio, and Coleman Company, Inc. of Wichita, Kansas, under which Century agreed to explain to the other parties the details of its manufacturing processes, supply drawings and specifications of its equipment and extend the services of members of its technical force to assist in erecting and installing apparatus constructed by the other parties, to grant certain manufacturing rights and licenses to make use and sell aggregate-lined boiler tanks and other receptacles to be made in accordance with Century's patents or patent applications. Each licensee agreed to pay specified royalties upon tanks manufactured under this process, with a minimum royalty of $1,000 per month and to pay $6,000 immediately as an advance upon the royalties. *159 Pursuant to the 1952 agreement and in addition to salary, the petitioner paid M. G. Burwell $5,400 in the fiscal year ended in 1952, $11,662.12 in the fiscal year ended in 1953 and $6,711.72 in the fiscal year ended in 1954. The petitioner ceased to operate at a profit in 1953 after competitors found they could use the machinery and process covered by these patent applications without a license from it. In 1957 the petitioner sold the patents Nos. 2641218 and 2700622, and terminated its operations. The stipulated facts are incorporated by this reference. Opinion The respondent contends that under the 1948 arrangement the corporation acquired the rights to future patents issued to or applied for by Burwell. The corporate resolution provided that in further consideration for the sale and transfer of assets and assignment of letters patent "issued to, applied for by or that may be issued to (or applied for by)" Burwell, the corporation assumed certain obligations. The respondent argues that by virtue of this provision the patents subsequently applied for by Burwell were equitably owned by the corporation prior to the 1952 contract, the royalties called for by that contract were *160 without consideration and were not a part of the cost of the patents subject to depreciation. The respondent also contends that the petitioner had ownership of the patents by reason of the law regarding ownership by an employer of inventions of employees, saying that Burwell was hired to invent for the corporation. The petitioner contends that the amounts it paid to Burwell in the fiscal years involved are deductible as depreciation on applications for letters patent, or as ordinary and necessary business expenses as license fees or in the nature of additional compensation to Burwell. It points out that the licensees soon discovered that the processes covered by the patent applications could be used without violation of the petitioner's patent rights and thereafter refused to pay further royalties, and that the petitioner could not license the processes to other manufacturers who learned that the methods were not exclusive. Hence, the patents had only a brief economic life which terminated in 1957 when they were sold for $1,000. The petitioner and Burwell did not interpret the 1948 arrangement as transferring title to the two inventions here involved for which patents were applied *161 for in 1951. The 1952 agreement recites the desire of petitioner to acquire the entire interest in certain patents and applications and refers to the earlier agreement as providing for assignment of the first two listed patents, but not of these patent applications. The parties made specific provision in 1952 for transfer of the patent applications here involved and stipulated for the payment to Burwell of 50 per cent of net royalties from licensing. Although Burwell was controlling stockholder and alter ego of the petitioner it was a fair and reasonable agreement to authorize payment to the inventor of 50 per cent of the proceeds of the licensing of the process to third parties. If the petitioner had an interest in the inventions in the nature of a "shop right," which is merely a nonexclusive right, that factor would not prevent the granting of greater rights by agreement of the parties nor make that agreement a sham and fiction. Roy J. Champayne, 26 T.C. 634, 646 (1956); Herbert C. Johnson, 30 T.C. 675, 683 (1958). The respondent contends that petent applications are not subject to depreciation, hence no deduction is allowable concerning the first patent, *162 issued June 9, 1953, except for periods after that date and none is allowable in any of the taxable years for the second patent, issued in 1955, citing Hershey Manufacturing Co., 14 B.T.A. 867 (1928) affd. 43 Fed. (2d) 298 (C.A. 10, 1930), and Sarkes Tarzian, Inc. v. United States, 159 Fed. Supp. 253 (1958). The petitioner cites Associated Patentees, Inc., 4 T.C. 979 (1945), in which the taxpayer acquired a number of patents having varying lives and was to receive other future patents and inventions from its stockholders for which it agreed to pay a share of royalties received from licensing others to use such patents and inventions. There we held that the payments to the inventors were capital expenditures for acquisition of the patents and inventions and that the taxpayer was entitled to recover its cost by depreciation deductions in each year in amounts equal to the payments made in such year. See also F. H. Philbrick, 27 T.C. 346 (1956), and Best Lock Corporation, 31 T.C. - (March 1959), where some patent applications were involved. Under the 1952 contract the petitioner was obligated to pay to Burwell that portion *163 of the fees it collected for licensing the use of the inventions. If the payments represent part of the cost of the inventions, it is reasonable to allow an equivalent amount as a deduction in accordance with the principle stated in Associated Patentees, Inc., supra. If not a part of the cost they are deductible as ordinary and necessary business expenses required under the contract. See Stewart Title Guaranty Co., 20 T.C. 630, 635 (1953); William M. Bailey Co., 15 T.C. 468, 484-5 (1950). Decision will be entered under Rule 50.