**LAN JEN CHU and Grace Y. P. Chu, Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**No. 73–1132.**

United States Court of Appeals, First Circuit.

Argued Sept. 6, 1973.

Decided Nov. 2, 1973.

William S. Estabrook, III, Atty., Tax Div., Dept. of Justice, with whom Scott P. Crampton, Asst. Atty. Gen., Ernest J. Brown, and Grant W. Wiprud, Attys., Tax Div., Dept. of Justice, were on brief, for appellant.

Paul J. Foley, Washington, D. C., with whom Robert H. Rines and Rines & Rines, Boston, Mass., were on brief, for appellees.

Before McENTEE and CAMPBELL, Circuit Judges, and KILKENNY, Senior Circuit Judge.*

McENTEE, Circuit Judge.

In this case we are faced with the question of whether the transfer by a taxpayer of a patent application to his controlled corporation may properly be considered the transfer of "property of a character which is subject to the allowance for depreciation" within the meaning of Internal Revenue Code § 1239(b), so as to treat the gain realized from such transaction as ordinary income rather than capital gain. Section 1239 provides in relevant part as follows:

"§ 1239. *Gain from sale of certain property between spouses or between an individual and a controlled corporation*

(a) *Treatment of gain as ordinary income.*—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

\*    \*    \*    \*    \*    \*

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, . . . ; any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

(b) *Section applicable only to sales or exchanges of depreciable property.* —This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167."

The taxpayer in the instant action, Lan Jen Chu, is an eminent authority on electromagnetic theory and antenna systems. In the course of a long and distinguished academic career, he has written numerous articles on these subjects, and has been granted approximately twenty-five different patents relating to antennas. On June 26, 1956, Chu and an associate, Ivan Faigen, filed an application with the United States Patent Office seeking the issuance of letters patent on a new, completely enclosed antenna in which would be housed a transmission-line system consisting of a balanced and unbalanced line. In their application, Chu and Faigen maintained that because of its novel design, the system would be substantially less cumbersome and costly than existing antenna sys-

tems, and additionally would be less subject to atmospheric interference. The application contained eighteen separate claims, the first thirteen of which can be characterized as pertaining to the principal antenna structure. Claims 14–18 involved an alternative structure, preferable only if more than two antenna units were "stacked" one on top of another. On July 5, 1957, the Patent Office informed Chu that claims 1–13 had been disallowed because of prior existing patents. However, it indicated that claims 14–18 "appear[ed] allowable."

Still confident about the eventual patentability of their invention, Chu and Faigen, on December 9, 1957, filed an amendment A to the initial application. Although the amendment took strong issue with the determination made by the Patent Office and sought to clarify and explain more fully the design of the antenna system, the application was once again denied. This time, however, the Patent Office indicated that, in addition to claims 14–18, claim 12 also appeared allowable. Subsequently, a further clarifying statement, Amendment B, was filed, and on September 14, 1959, the Patent Office issued a notice adhering to its previous position.

Several months later, on December 18, 1959, Chu assigned his $^{11}/_{12}$ interest in the patent application to Chu Associates, Inc. At the same time, Rines (Faigen's assignee) made a similar assignment with respect to his $^{1}/_{12}$ interest. Pursuant to these assignments, Chu and Rines were to receive, in respective $^{11}/_{12}$ and $^{1}/_{12}$ proportions, a minimum purchase price of $317,000, to be paid over the life of the patent that both expected would be ultimately granted.[1]

Chu Associates, Inc. was incorporated under the laws of the Commonwealth of Massachusetts in August 1959 for the purpose of manufacturing antennas. The Articles of Organization provided for an authorized capital stock of 1,000 shares of no-par common. At incorporation, however, only ninety shares were issued and paid for. Chu received eighty shares and Faigen received ten shares. The purchase price to each was $200 per share resulting in a paid-in capital of $18,000.

On December 15, 1959, just three days before the assignments of the patent application in question, the corporation held a special joint shareholders and directors meeting. At that meeting, a resolution was adopted declaring a 100% stock split on the ninety existing shares. In addition, a second resolution was adopted, which provided:

> "VOTED: To issue in addition to the shares of no par common stock already outstanding, 110 additional shares so as to make the number issued and outstanding 200 shares of no par common stock, of which 90 shares shall be issued to accomplish the stock split in accordance with the preceding vote, and the balance shall be issued to subscribers for $100.00 per share."

At the conclusion of the stock transactions contemplated by the approved resolutions, Chu was to own 160 of the outstanding 200 shares of the corporation, or exactly eighty percent of its voting strength. Thus, the stock transfer book indicated that on December 15, 1959, eighty additional shares had been issued to Chu so as to effectuate the stock split, ten additional shares had similarly been issued to Faigen, and the twenty

---

1. Under the terms of the assignments, Chu and Rines were to receive a total of $2,000 immediately; $60,000 in 1960; and 15% of the gross selling price of every antenna system manufactured and sold by Chu Associates, Inc. in each year thereafter until the patent expired (but not less than $15,000 per year). At the time of the assignments, Chu Associates, Inc. had already received assurances from the United States Air Force that it intended to contract to purchase approximately $400,000–$500,000 worth of systems embodying the new antenna design. During the taxable years in question (1962–1965), Chu received income under his assignment in the respective amounts of $84,020.14, $67,572, $74,629 and $25,405.

remaining newly issued shares had been sold to certain other individuals.

However, the transfers suggested by the stock transfer book may not have been fully completed by December 18, 1959, the crucial date on which the patent application was assigned to Chu Associates, Inc. The corporate balance sheet for the taxable year ending September 30, 1960, revealed a paid-in capital of $19,800, thus indicating that only eighteen of the twenty shares to be sold to others pursuant to the December 15 resolutions had been actually issued and paid for.[2]

Sometime after the transfer of the application, on March 8, 1960, an Amendment C was filed with the Patent Office, once more attempting to clarify certain disputed aspects of the antenna's design. This time the effort was successful, and on September 7, 1960, the Patent Office informed Chu that a "Notice of Allowance" on all 18 claims had been approved. Subsequently, on May 30, 1961, letters patent were issued.

Since the patent was granted, Chu Associates, Inc. has sold numerous antennas systems under patented claims 1–13. However, none of the systems merchandised by the corporation has yet to involve application of the alternative design embodied in claims 14–18. Pursuant to the December 18, 1959, assignments, Chu has received substantial sums of money, all of which he reported as long term capital gain. The Commissioner, deeming § 1239 applicable under the facts of this case, sought to assess a deficiency by requiring that those sums be taxed at ordinary income rates.

In a lengthy opinion, the Tax Court explicitly rejected the government's contention that a patent application could be considered property "of a character subject to depreciation" within the intendment of § 1239(b), and thus concluded that § 1239 had no application. 58 T.C. 598, 609 (1972). The Tax Court also considered, and rejected, the argument that under the recent Seventh Circuit holding in Estate of Stahl v. Commissioner, 442 F.2d 324 (1971), the patent application at issue here had sufficiently "matured" so as to be viewed, at the time of transfer, as a depreciable patent governable by § 1239. By predicating its opinion on the "depreciable property" aspect of § 1239(b), the Tax Court found it unnecessary to decide whether the "control" test of § 1239(a) had been satisfied, though it intimated a belief that the government's position on this issue was strong. Because we feel constrained to agree with the Tax Court that the patent application transferred here was not "property of a character" subject to the depreciation allowance, we similarly find it inappropriate to pass upon the questions regarding control which are presented by these facts.[3]

2. When the original ninety shares were issued, at $200 per share, in August 1959, the paid-in capital was $18,000. Of the 110 shares authorized by the December 15 resolutions, ninety shares were to be issued as a simple stock dividend to Chu and Faigen and would thus not have increased the paid-in capital. The final twenty shares, to be purchased by subscribers at $100 per share, should have, if actually issued and sold at the time indicated in the stock transfer book, produced an additional paid-in capital of $2,000, for a total capital account of $20,000. If we were to assume that by the time of the assignments of the patent application, only eighteen of the twenty shares had been issued and sold, Chu would own 80.8% of the corporation's voting strength (160 out of 198 shares). Since

§ 1239 would only have application to this case if, at the time of the assignment, the taxpayer owned "*more than* 80% in value" of his corporation's stock, the exact status of the newly authorized shares would normally become extremely critical. It appears from the record that the corporation received the purchase price for the remaining two shares somewhere between October 1, 1960, and December 31, 1960, or approximately one full year after the transfer of the patent application.

3. We note in passing that even if the stock issuance authorized by the December 15 resolutions had been completely effectuated, leaving Chu with exactly eighty percent of the corporation's voting strength, it is not entirely clear that he would necessarily es-

The government argues strongly that the broad language of § 1239(b) (property *of a character* subject to depreciation) justifies the conclusion that the limitations on capital gain treatment imposed by that section apply not only to the sale or exchange of depreciable property, but also to the transfer of property of the type which might ultimately become depreciable. Thus, while the government is apparently willing to concede that a mere patent application should not be considered depreciable property in the strictest sense, it nevertheless contends that since the application, if eventually approved, would then become depreciable, American Chemical Paint Co. v. Commissioner, 66 F.2d 381 (3d Cir. 1933); Kershaw v. United States, 180 F.Supp. 415, 148 Ct.Cl. 693 (1960), § 1239 should govern transactions involving the application itself. If we could consider the question strictly from the vantage point of developing a sound federal tax policy, this approach would indeed have some merit. Unless § 1239 is interpreted as the government suggests, a significant loophole could be created in the application of that section. It would be a simple matter for a tax conscious inventor to sell his pending application to a controlled corporation, pay capital gains on the excess of the purchase price over his basis, and then, once the application has been approved, allow the corporation to write-off against ordinary income, depreciation on the now stepped-up basis of the patent. Indeed, by immediately paying taxes on his profit at the favorable capital gains rate and thereby achieving long term avoidance of a comparable amount at ordinary income rates, the result is very likely to be a net loss to the public fisc.

However, much as we recognize the salutary effect of the government's position, our role as a court is not to formulate tax policy in the first instance, but rather to ensure that the enactments of Congress are implemented in accordance with their intended legislative design. McClain v. Commissioner, 311 U.S. 527, 530, 61 S.Ct. 373, 85 L.Ed. 319 (1941); Graham v. Commissioner, 304 F.2d 707, 710 (2d Cir. 1962). Our examination of the legislative history of § 1239 convinces us that this section was intended to apply only to depreciable property. Consequently, the section as presently constituted can have no application to sales or exchanges of patent applications.

■ We begin by noting that the caption to § 1239(b) states explicitly that the section is "applicable only to sales or exchanges of depreciable property." While it may be true, as the government urges, that the language of the caption is not necessarily controlling, Application of Magnus, 299 F.2d 335, 337 (2d Cir. 1962); *cf.* Brotherhood of Railroad Trainmen v. Baltimore & O. Rr., 331 U.S. 519, 528, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947), such language certainly does provide at least some evidence of the intended Congressional scheme.

The House Report on the Revenue Act of 1951 which created the predecessor to

---

cape the ambit of § 1239(a). Recent decisions have indicated that the "more than 80% *in value*" test of that section requires a subjective determination of the comparative fair market value of the taxpayer's shares, rather than simply a numerical count. *See* United States v. Parker, 376 F.2d 402 (5th Cir. 1967); Trotz v. Commissioner, 361 F.2d 927 (10th Cir. 1966). Thus, these cases suggest that such considerations as a premium for management control, or restrictions on minority stock alienability, might add sufficient value to a stock ownership of technically eighty percent or less of the corporate voting strength, so as to satisfy § 1239(a). However, this view does not have complete support among the earlier cases, *see, e. g.,* Mitchell v. Commissioner, 300 F.2d 533 (4th Cir. 1962) (taxpayer owned 79.54% of stock; § 1239(a) held not satisfied), and has been subjected to the criticism that such ephemeral subjective evaluations would add unwarranted uncertainty to the application of the tax laws. Note, "Meaning of 'More than 80 Percent in Value of the Outstanding Stock' Under Section 1239." 66 Mich.L.Rev. 533, 536–540 (1968).

§ 1239 [4] noted that the purpose of that section was "to forestall the practice of selling *depreciable assets* to controlled corporations in order to obtain the substantial tax benefits available under existing laws." H.Rep.No.586, 82d Cong., 1st Sess. (1951) *reprinted in* 1951 U.S. Code Cong. & Admin.Service, pp. 1781, 1807 (emphasis added). The report went on to state that "this bill eliminates the tax advantage from such transactions by denying capital-gains treatment to the transferor with respect to sales or exchanges of *depreciable property. . . ." Id.* (emphasis added).

Although the Senate recommended deletion of the section for reasons not relevant to our inquiry, it also recognized that the application of the bill was strictly limited to transactions in depreciable property. S.Rep.No.781,. 82d Cong., 1st Sess. (1951) *reprinted* in 1951 U.S.Code Cong. & Admin.Service, pp. 1969, 2041–2042. Eventually, the section was salvaged in the House-Senate conference committee, with the conferees noting that the new statute would "provide that in the case of a sale or exchange, directly or indirectly, of *depreciable property* . . . (2) between an individual and a [controlled corporation], any gain recognized to the transferor shall be considered ordinary income and not capital gain." Conf.Rep. on H.R. 4473, 82d Cong., 1st Sess. (1951) *reprinted* in 1951 U.S.Code Cong. & Admin.Service, pp. 2121, 2135 (emphasis added). Moreover, administrative regulations promulgated after enactment of the section are entirely consistent with the notion that Congress intended § 1239 and its predecessor to apply only to depreciable property. Treas.Reg. § 1.1239–1 (1960).

It is understandable why Congress would intend § 1239 to apply only to gain received from the transfer of property which could then be immediately depreciated by the transferee at the stepped-up basis. The evils against which § 1239 were designed would be virtually certain to occur where the taxpayer transfers depreciable property to his controlled corporation. The same may not properly be said of the transfer of property which only *might* become, at some prospective point in time, subject to depreciation as an off-set to ordinary income. Thus, we must not forget that not every patent application is ultimately approved.[5] Consequently, were we to apply the interpretation of § 1239 sought by the government, the inventor who has the misfortune to transfer a patent application that is subsequently disapproved would face the worst of both possible worlds: he would pay ordinary income rates on his initial gain from the transfer, while his controlled corporation would never be able to take any depreciation deduction against ordinary income. It would be entirely rational, therefore, for Congress to conclude that § 1239 should apply only in those instances where the dangers of tax abuse were most acute (i. e. the transfer to a controlled corporation of depreciable property), while denying § 1239 treatment to situations where unwarranted tax results might occur.[6]

---

4. The section was carried forward unchanged as § 1239 of the Internal Revenue Code of 1954. *See* H.Rep.No.1337, 83rd Cong., 2d Sess. (1954) *reprinted* in 1954 U.S.Code Cong. & Admin.News p. 4428; S.Rep.No.1622, 83rd Cong., 2d Sess. (1954) *reprinted* in 1954 U.S.Code Cong. & Admin.News p. 5087.

5. In 1970, for example, approximately 100,000 patents were applied for. Of that number, nearly 34,000 were rejected. Annual Report of the Commissioner of Patents for Fiscal Year 1970, p. 16.

6. It is true, of course, that on the facts of this case, no such unfortunate tax result would occur since the patent application at issue here was eventually approved. However, this does not alter the fact that were we to adopt the government's interpretation, many such unwarranted tax results would necessarily occur in other cases whenever an application was ultimately denied. In exercising our obligation to construe this statute, no compromise result is possible. We cannot say that a patent application *is* "property of a character" subject to depreciation if *it is* eventually approved, while such an application *is not* "property of a character" subject to depreciation if it is not eventually approved.

■ We thus conclude that when § 1239 is considered in the light of its apparent policies and the legislative history that coincided with its passage, it becomes clear that this section is applicable strictly to the transfer of depreciable property. The question then is whether the patent application involved in this case can properly be treated as "depreciable property" within the intendment of § 1239. We hold that it can not.

There can be no doubt that, in general, patent applications are not depreciable property. United States Mineral Products Co. v. Commissioner, 52 T.C. 177 (1969); Hershey Mfg. Co. v. Commissioner, 14 B.T.A. 867, aff'd, 43 F.2d 298 (10th Cir. 1930). Unless the application is subsequently approved, an event of uncertain outcome, it has only inchoate property characteristics, Mullins Mfg. Co. v. Booth, 125 F.2d 660, 664 (6th Cir. 1942). It certainly has no definitive life over which to be depreciated. 4 Mertens § 23.74 (1966).

However, the Seventh Circuit in Estate of Stahl v. Commissioner, 442 F.2d 324 (1971), affirming in part, reversing in part, 52 T.C. 591 (1969), has recently held that at some point in the application process, a patent application may have so fully "matured" as, in effect, to be considered a patent—and thus depreciable property—for the purpose of § 1239. Whatever the validity of the *Stahl* decision, a question as to which we intimate no view, it is clear that application of that opinion to our facts would prove of no assistance to the government's contentions.

In *Stahl,* the taxpayer, in return for $300,000 worth of promissory notes, transferred to his wholly-owned corporation various (1) patents, (2) patent applications as to which notices of allowance or indications of allowability had been received prior to transfer, and which ultimately matured into patents, and (3) patent applications which had, prior to transfer, been rejected by the Patent Office. A specific allocation of the purchase price, as reflected in the promissory notes, was made as between the patents ($140,000) and the patent applications ($160,000). Moreover, with respect to the applications themselves, greater amounts were assigned to those applications which had been approved as compared with those which had been rejected.[7] As the corporation gradually paid off the promissory notes, the taxpayer reported his profit as capital gain. The Commissioner sought to have the entire transaction governed by § 1239. Instead, the Court of Appeals ruled that as to that proportion of the gain allocable to the patents and to those patent applications which had been allowed or appeared allowable prior to transfer, § 1239 did indeed apply. However, the court explicitly rejected the contention that this section should also govern the gain on that part of the transaction involving the disapproved applications, even though one of those applications was ultimately approved.

In addressing itself to the patent applications which had been allowed or which appeared allowable, the Seventh Circuit noted that "these three applica-

---

In the first place, the tax must be paid at the time of the transfer, not some months or years afterward when final action on the patent application is taken. Clarity and certainty in application of the tax laws must be maintained. But more important, formulation of such a compromise, while perhaps satisfying our policy goals, is clearly without the scope of our judicial function and is properly a matter to be left for the Congress, which is in a better and more appropriate position to harmonize the competing interests.

7. Notices of Allowance had been received for patent application numbers 274,761 and 274,762. They were each assigned a price allocation of $50,000. Application number 361,229 had received a notice that two of its claims "appear[ed] allowable." It was also assigned a value of $50,000. The remaining two applications, numbers 450,931 and 454,134 had been rejected and were assigned a value of $5,000 each. Some time after the transfer, the Patent Office reversed itself as to application number 450,-931, and letters patent on that application were ultimately issued.

tions were virtually certain to mature into depreciable patents, as they did, *with the merest of diligence by the transferee in processing the applications after the sale.*" 442 F.2d at 328 (emphasis supplied). Consequently, it ruled that at the time of transfer, those applications had, for the purposes of § 1239, "matured" into depreciable patents, and were thus limited to ordinary income treatment.[8]

Even under the *Stahl* rationale, we cannot say that the patent application involved in this case had sufficiently matured so as to trigger the limitation on capital gain benefits imposed by § 1239. In *Stahl* two of the three applications which the court found to be, in effect, depreciable patents, had already been approved and Notices of Allowance had appropriately issued. 442 F.2d at 326–328. The court, therefore, assumed that all that remained before issuance of letters patent was the mere ministerial act of "processing" the application. Even if such an assumption was completely valid, it is clear that the state of Chu's application in the instant case was much further removed from the patent issuance stage. Not only had no Notice of Allowance been granted on his application at the time of transfer, but the primary claims of that application had been thrice rejected. Indeed, *Stahl* actually provides ample authority for refusing § 1239 coverage here since, even in that case, the two applications which had been rejected prior to transfer were held to escape the ambit of § 1239 despite the fact that one of those applications was eventually approved. *Id.*

It is true, of course, that *Stahl* also accorded § 1239 treatment to an application where, although no Notice of Allowance had been granted, the Patent Office had noted that two claims "appeared allowable." *Id.* at 328. And we note that with respect to Chu's application, the Patent Office had indeed indicated that the alternative design (claims 14–18) similarly appeared allowable, as did claim 12 of Chu's primary structure. In considering this problem below, the Tax Court stated:

"We note that as to one of the three applications in *Stahl,* reference is made to the fact that there had been official notification that two of the claims 'appear[ed] allowable,' and, of course in the present case, the Patent Office had originally approved claims 14–18 as well as certain of the other claims in later notifications. But in the instant case claims 1–13 were the 'heart' of the patent, and until they had been declared 'allowable', the application as a whole must in substance be regarded as having been rejected. On the other hand, we have no knowledge as to whether the two claims regarded as 'allowable' in *Stahl* represented the essence of the invention, and in the absence of any further clarifying information, we may fairly assume that the Seventh Circuit regarded the basic claims in respect of that application to have been approved. In the instant case, it is clear that the application had not 'matured' to the point that it could be regarded as the substantial equivalent of a patent within the analysis set forth by

**8.** The Seventh Circuit may have been too quick to assume that simply because a Notice of Allowance had been granted, a patent would ultimately issue in due course should the applicant exercise only the "merest of diligence" in "processing the application." Under Rule 313 of the Rules of Practice of the United States Patent Office, the allowance may be withdrawn at any time prior to issuance of letters patent for reasons of mistake on the part of the Patent Office, fraud or illegality in the application, or any alleged "interference" (i. e.

where some other applicant is claiming the same invention). Had the Seventh Circuit fully considered these potential impediments to the eventual issuance of a patent even after receipt of a Notice of Allowance, it might not have concluded that these patent applications were sufficiently "matured" for purposes of § 1239. What has been said here is even more pertinent where no Notice of Allowance has been issued, but the Patent Office merely indicates that certain claims "appear allowable."

the Court of Appeals. We regard our disposition of this matter as wholly consistent with that anaylsis."

We are in complete agreement with the view thus expressed by the Tax Court. Moreover, we note that all of the income received by Chu pursuant to the assignment of his patent application has come as a result of the manufacture and sale of antenna systems embodying the primary design (claims 1–13). Chu Associates, Inc. has never manufactured any system using the alternative structure described in claims 14–18. It is our conclusion, therefore, that even assuming the validity of the *Stahl* doctrine, it is beyond doubt that the patent application at issue in this case had not sufficiently matured within the meaning of that decision so as to be considered a depreciable patent for purposes of § 1239.

If nothing else, the facts of this case demonstrate some of the infirmities which presently attend application of § 1239 to the nether area of property which, at the time of transfer to a controlled corporation is not depreciable, but which may subsequently become depreciable, It may well be that reform is needed.[9] But in the exercise of our judicial function, this court cannot legislate in order to accomplish such reform. That obligation must be left to the Congress.

The judgment of the Tax Court is affirmed.

LEVIN H. CAMPBELL, Circuit Judge (concurring in the result).

Current Tax Court precedent, supported by Stahl v. CIR, 442 F.2d 324 (7th Cir. 1971), holds that patent applications are ordinarily not property "of a character which is subject to the allowance for depreciation." A reading of neither § 1239 nor the Regulations would lead a taxpayer to conclude otherwise. The taxpayer is entitled to rely upon these decisions and the everyday reading of the statute and regulations when making decisions that will irrevocably fix his liability for taxes. When the decision is a close one, favoritism, if any, should be for the taxpayer rather than for the government. Fabreeka Products Co. v. CIR, 294 F.2d 876 (1st Cir. 1961); CIR v. Rabenold, 108 F.2d 639 (2d Cir. 1940). I therefore concur.

But the Supreme Court has also admonished us that when the taxpayer is, as here, claiming capital gains rather than ordinary rates, the construction should bear more strongly against the taxpayer. Capital gains are the exception, not the rule. CIR v. Gillette Motor Transport, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); Corn Products Co. v. CIR, 350 U.S. 46, 76 S. Ct. 20, 100 L.Ed. 29 (1955). The issue becomes more difficult still because § 1239, according to its legislative history, is a "penalty" provision, intended to discourage transfers to controlled corporations that enable the taxpayer to take income at capital gains rates while providing the corporation with an asset of stepped-up basis that can be depreciated against income ordinarily taxable at ordinary income rates. The question is whether Congress intended to reach only assets that were depreciable in the hands of the transferee on the day of transfer or whether it wrote a statute

9. One sensible avenue of reform was suggested at oral argument by my brother Campbell. Most assignments of patent applications to controlled corporations can be expected to involve royalty arrangements whereby the transferor is to receive income spread over the life of the expected patent. Congress could simply provide that although the initial transfer of a mere patent application to the corporation would not result in § 1239-type treatment on the immediate sums received, once the patent is ultimately approved, all subsequent royalty payments would become subject to ordinary income taxation. Thus, the taxpayer would not be unjustly penalized if his application were eventually disapproved. Correspondingly, the tax abuses envisaged by § 1239 would be effectively thwarted precisely at the time they would appear most likely to result.

with broader impact. The meagre legislative history, marshalled by the court's opinion here, talks of "depreciable" property. But the statute itself modifies "depreciable" with the words "of a character." We can neither read them out of the statute nor blithely assume that the patent application here, which was probably not depreciable, at least under Revenue Ruling 67–136, at the time of transfer, possessed the requisite "character."

In situations like this one, a Treasury Regulation would be of invaluable assistance to court and taxpayer alike. Had the Commissioner's present position been foreshadowed in a properly drawn regulation setting out the conditions under which patent applications were property "of a character . . . subject to the allowance for depreciation," I would have found against the taxpayer.

Treasury Regulations must be upheld if they "implement the congressional mandate in some reasonable manner." United States v. Cartwright, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), quoting from United States v. Correll, 389 U.S. 299, 307, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967). It is virtually inescapable that Congress, when it passed § 1239, meant to penalize transactions of the sort involved in this case. This transaction, no less than one involving property potentially depreciable (but not actually being depreciated) at the time of transfer, poses the threat of the evil Congress clearly sought to reach. *Cf.* Twentieth Century-Fox Film Corp. v. CIR, 372 F.2d 281 (2d Cir. 1967) (film capable of depreciation but not actually depreciated); 512 West Fifty-Sixth Street Corp. v. CIR, 151 F.2d 942 (2d Cir. 1945) (option is of depreciable character even though non-depreciable).

Patent applications have all or virtually all of the attributes one normally associates with a depreciable "character." They are used "in trade or business." 26 U.S.C. § 167. Pekras v. CIR, 2 T.C. M. 195, aff'd, 139 F.2d 699 (6th Cir. 1943). They meet the requirements generally laid down in Treas.Reg. 1.-167(a)–2, since they are "wasting" assets that decline in value over time. Indeed, patent applications are, in some circumstances, depreciable assets. *See* Rev.Rul. 67–136, 1967–1 Cum.Bull. 58. The only bar to depreciating all patent applications is that they are of uncertain duration, so that it is difficult to ascertain the proper amount of depreciation in any given year. Even that problem is not insuperable; Rev.Rul. 67–136 solves it by allowing depreciation equal to the total royalty payments attributable to the application within the tax year. The Tax Court itself has acknowledged, in some cases not cited in its opinion in the instant case, that patent applications are of a depreciable character. Best Lock Corp., 31 T.C. 1217, 1234 (1959); Century Tank Mfg. Co., 18 T. C.M. 430 (1959). In one case the Tax Court characterized patent applications as intangible property "subject to depreciation in the hands of the transferee." McDermott, 41 T.C. 50, 58 (1963).

Patent applications represent the same underlying *res*—the invention—as do patents. Both application and patent represent the full bundle of legal rights available at the time; both waste; both are, in theory if not in fact, depreciable. The business transaction in the instant case reflects this economic reality. Taxpayer sold all of his rights in the patent to Chu Associates. The contract provided for royalty payments over time whether or not a patent was granted. The grant of a patent would not increase the size of the royalties, nor would its refusal reduce them. The tax treatment for purposes of other sections of the Internal Revenue Code parallels this structure. Chu Associates acquired one basis for the application that carried over to the patent when granted; the application and patent are treated as identical for basis purposes. It is difficult to see why they should be treated differently for purposes of § 1239.

**706**

Regulations could, I feel, accord with the statute in either of two forms. First, they could set out the attributes that describe "of a character subject to the allowance for depreciation." A second approach, more complex, would avoid what the court in this case sees as the "worst of both worlds" situation in which admittedly *non*-depreciable applications are involved and the taxpayer "loses" the opportunity to transfer these to a controlled corporation while being taxed at capital gain rates. The regulation might create a rebuttable presumption that all patent applications are depreciable. This is a reasonable presumption, in light of the data in footnote 5 of the court's opinion. It is a particularly appropriate presumption in cases like the present one, in which taxpayer has engaged in a sophisticated commercial transaction which discloses that taxpayer was relatively certain that the patent would be granted, and Chu Associates was willing to pay substantial sums for the applications on the assumption that a patent would issue. Taxpayer has firmly asserted a belief in patentability; it would not seem unjust to hold him, in tax matters, to the same assumption on which he acted in his dealings with Chu Associates.

Such a presumption, although powerful, could be rebutted. The regulation might allow taxpayer to apply to the Commissioner before transfer for a ruling that the application was not depreciable for reasons peculiar to itself. It might also provide that taxpayer could rebut the presumption at some time after the transfer.

In conclusion, I support the court's decision because the language of a tax statute should not be turned into a trap for the unwary. But I suggest that this may be a situation where, with the aid of appropriate Treasury Regulations, the Commissioner should be encouraged to accomplish what it is unfair to permit under the unaided language of the tax statute.