The **NEWSPAPER GUILD**, Plaintiff,

v.

**William B. SAXBE**, Defendant.

**Civ. A. No. 74-308.**

United States District Court,
District of Columbia.

July 23, 1974.

Rehearing Denied Sept. 27, 1974.

Victor H. Kramer, Richard B. Wolf, John H. Harwood, II, Washington, D. C., for plaintiff; Davis S. Barr, Washington, D. C., of counsel.

Charles S. Stark, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This case concerns the Justice Department's interpretation of section 4(b) of the Newspaper Preservation Act. 15 U.S.C. §§ 1801–1804. This court has jurisdiction under 28 U.S.C. §§ 1331, 1337.

The Newspaper Preservation Act, enacted July 24, 1970, provides a limited exemption from the antitrust laws for certain joint newspaper operating arrangements [1] that comply with the

---

I. A joint newspaper operating arrangement is any contract or other agreement between two or more newspaper owners pursuant to which the newspapers share facilities for printing, circulation, and other departments, except that there can be no merger of editorial or reportorial staffs. 15 U.S.C. § 1802(2).

terms of the Act. The Act provides a means by which two or more newspapers, all but one of which is "failing," [2] can apply to the Attorney General for such an exemption. Section 4(b) provides:

It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter. 15 U.S.C. § 1803(b).

Despite this clear language that all joint newspaper operating arrangements not already in existence must obtain prior consent from the Attorney General, the Justice Department on December 20, 1973, issued the following regulation:

The Newspaper Preservation Act does not require that all joint newspaper operating arrangements obtain the prior written consent of the Attorney General. The Act and these regulations provide a method for newspapers to obtain the benefit of a limited exemption from the antitrust laws if they desire to do so. Joint newspaper operating arrangements that are put into effect without the prior written consent of the Attorney General remain fully subject to the antitrust laws. 28 C.F.R. § 48.1 (1974), 39 Fed.Reg. 7 (Jan. 2, 1974).

Plaintiffs seek a declaratory judgment that such regulation is an unlawful interpretation of the Act and an injunction against implementation of said regulation. The matter is presently before the court after oral hearing on defendant's motion to dismiss and plaintiff's motion for summary judgment.

The defendant agrees that if section 4(b) is read literally, it is unlawful for any joint newspaper operating arrangement to be put into effect without prior Attorney General consent. Defendant's Motion to Dismiss at 5. The general rule is that where statutory language is clear, a court should not inquire further into the legislative purpose or intent but rather should order compliance with the clear language of the statute. Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 89, 56 S.Ct. 70, 80 L.Ed. 62 (1935).

Nevertheless, defendant urges that to read section 4(b) literally is to ignore Congress' intent and purpose and will lead to futile and absurd results. This court agrees that on occasion a court may deviate from otherwise clear and unambiguous statutory language. "A court may qualify the plain meaning of a statute when its consequences— plainly absurd, inequitable, or in conflict with legislative history—permit the court to discern a clear legislative intention to the contrary." Center for National Policy Review on Race & Urban Issues v. Weinberger, 502 F.2d 370 (D.C.Cir. 1974). However, on review of the legislative history and Congressional purpose in enacting the Act, this court finds no clear Congressional purpose or intent contrary to the clear and unambiguous language of section 4(b). Further, this court perceives no futile or absurd results that may flow from a literal interpretation of section 4(b). Accordingly, this court will grant plaintiff's motion for summary judgment and will order the requested injunctive and declaratory relief.

## I.

To understand clearly the defendant's position and this court's rejection thereof, it is important to relate briefly the background of the Newspaper Preservation Act. The Act was enacted because of Congressional concern

---

**2.** A failing newspaper is one which "is in probable danger of financial failure." 15 U.S.C. § 1802(5).

about the trend toward one-newspaper cities. In 1910, 60 percent of American dailies served cities in which there were two or more such newspapers; by 1968, the same figure had dropped to 15 percent. H.R.Rep. No. 91–1193, at 3–4, U.S. Code Cong. & Admin.News 1970, p. 3547. In large part this decline was due to the increasing economic difficulty facing competing dailies. To meet this problem, competing dailies in some cities began as early as 1933 to enter into joint newspaper operating agreements. By 1966, there were 22 such arrangements. *Id.*

In 1964, the Justice Department initiated an investigation of these arrangements for possible violations of the antitrust laws. Suit was filed in 1965 and culminated in Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), which held the joint operating arrangement in Tucson, Arizona, to be violative of sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act. The Court rejected the newspapers' "failing company" defense because they could not show that one of the papers actually was contemplating liquidation and that there was no other viable alternative, including a purchaser or bankruptcy reorganization.

During the *Citizen Publishing* litigation various bills were introduced in Congress to grant an antitrust exemption for joint newspaper operating arrangements. The Newspaper Preservation Act, passed 16 months after the *Citizen Publishing* decision, was a legislative overruling of the Supreme Court's decision and a grant of a limited antitrust exemption for certain joint newspaper operating arrangements. In crucial part the Act provides that those joint newspaper operating arrangements which were in existence at the time of passage of the Act are permitted to continue with only minor qualification. 15 U.S.C. § 1803(a). As to joint operating arrangements not previously in existence, however, Congress enacted section 4(b), which, on its face, makes it per se unlawful for any new arrangement to be put into effect without the prior consent of the Attorney General.

The Justice Department contends that it was the Congressional intent that section 4(b) offer a means by which joint operating arrangements like those in *Citizen Publishing*, all of which probably were violative of the antitrust laws, could obtain an antitrust exemption. The Justice Department correctly asserts that plaintiff's literal construction of section 4(b) would make illegal joint operating arrangements that are put into effect in the future without Attorney General consent, even if they would not have violated the antitrust laws prior to passage of the Act. The Justice Department also notes that many of these arrangements that would not have been in violation of the antitrust laws will be unable to obtain consent because none of the papers will be "failing." *See* 15 U.S.C. § 1803(b). Hence, defendant urges that this court accept its interpretation under which failure to obtain prior consent would not be per se illegal but would only leave the newspapers involved fully subject to the antitrust laws.

This court rejects the defendant's argument, finding rather that a literal interpretation of section 4(b), even with the consequences defendant recounts, leads to no absurd or inequitable results in conflict with legislative history or Congressional purpose. In passing the Newspaper Preservation Act, Congress broadly expanded the "failing newspaper" definition used by the Supreme Court and legislatively overruled the Court's 16-month-old decision. Further, Congress granted a broad exemption for all 22 joint newspaper operating arrangements then in existence and specifically authorized reinstatement of the Tucson plan. Plaintiff is correct in terming this "an enormous plum." There was considerable opposition to the Act. *See* H.R.Rep. 91–1113, at 9, 12–13, U.S.Code Cong. & Admin.News 1970, p. 3547. As Senator Dirksen stated:

[T]here has been a genuine fear expressed by suburban papers, newspa-

per unions, and some segments of the public, and to the dangers inherent if some of these other papers were to improperly enter into joint operating arrangements—resulting in what might be a stronger competitive force, the loss of jobs, and maybe, eventually, a loss of independent viewpoints. Hearings on S. 1520 Before the Subcomm. on Antitrust and Monopoly of the Senate Judiciary Comm., 91st Cong., 1st Sess. 9 (1969).

It was in light of this opposition and the broad exemption granted to pre-existing joint operating arrangements that Congress finally enacted section 4(b). Upon consideration of these factors the court concludes that Congress very reasonably might have intended the literal words of section 4(b)—that no new arrangements be put into effect without prior approval.

Senator Dirksen originally suggested a proviso to section 4(b) that stated:

[T]hat any publication may at any time propose, enter into, perform or enforce an agreement with any person if such agreement was not prohibited by law prior to the effective date of this Act. *Hearings, supra* at 8.

Senator Dirksen explained the proviso's purpose as "to make sure that we have not inadvertently made illegal · . . . arrangements which are now lawful." *Id.* at 9. This proviso was not enacted in the final law. The Justice Department urges, without citation, that the proviso was dropped because it was clear Congress so intended even without the proviso. This court declines to so assume. It appears just as probable that the proviso was dropped in face of considerable opposition to the bill and hence it was understood that all joint operating arrangements that might be entered in the future must have prior approval.

A literal interpretation of section 4(b) makes further sense in light of the problems that would arise if prior consent was not required of all such arrangements. Arrangements perhaps would be put into effect without prior approval but with substantial economic change by the parties. If the Justice Department then brought suit, there would be considerable economic dislocation and perhaps some hesitancy to sue unless the violation was flagrant. The *House Report* indicates that Congress was concerned with just such economic dislocation when it decided to grant the broad exemption to all 22 arrangements in existence when the Act passed. *See* H.R.Rep. 91–1193, at 9, U.S.Code Cong. & Admin.News 1970, p. 3547. Given these problems and the substantial opposition to the Act, it is reasonable to assume that Congress intended prior consent for all future arrangements to be mandatory, thus avoiding complex litigation and economic disruption and also assuring that the antitrust exemption would be kept narrow and closely enforced.

Finally, this court rejects defendant's argument that a literal reading of section 4(b) is incorrect because it could lead to invalidation of many joint newspaper operating arrangements that would have been legal under prior law but now cannot be put into effect because consent cannot be obtained. Congress declined to include an express proviso which would have abated this fear. *See supra.* More important, the Justice Department's concern is more imaginary than real. These arrangements are entered between competing newspapers; such arrangements between newspapers in different cities—as hypothesized by defendant—simply do not exist.[3] Since this court concludes that these arrangements are and will be entered into by competing daily newspapers, it is consistent with the Act to require all such arrangements to obtain prior Attorney General consent.[4] This will lead to no futile, absurd, or inequitable results or results clearly at odds

3. The Justice Department has not cited to this court a single such arrangement, legal before the Act, that will be illegal after the Act because of inability to obtain consent.

4. Even if two competing papers in the same city enter a joint newspaper operating arrangement that would have been legal under prior law—and again no such instance has

with Congressional purpose. Hence, this court declines to deviate from the clear words of the statute.

## II.

Both parties assert that the legislative history supports their interpretation of section 4(b). However, the legislative history is, at best, unclear on this issue. Only one portion of the legislative history appears to support the defendant's position. This passage states that "joint newspaper operating arrangements, to have the benefit of an exemption from the antitrust laws, must have the prior written consent of the Attorney General. . . ." H.R.Rep. 91–1193, at 11, U.S.Code Cong. & Admin. News 1970, p. 3556. This passage implies that where no consent is obtained, any arrangement remains fully subject to the antitrust laws and similarly implies that failure to obtain consent is not per se illegal. However, the same report states "[t]he bill requires the Attorney General to review and approve the terms of any joint newspaper operating arrangement not already in effect." Id. at 10, U.S.Code Cong. & Admin.News 1970, p. 3554.

The hearings and debates on the Act, while not ordinarily as valuable as the final report, support the plaintiff's interpretation of the Act. This court considers them valuable in this case since the House Report is far from conclusive. Thus, Senator Dirksen, speaking of a somewhat different version of the Act, stated of section 4(b):

> Before any new joint operating arrangements could come into being, the papers involved would be required to come before the Attorney General for his approval. Hearings, supra at 9.

And Richard McLaren, Assistant Attorney General, Antitrust Division, Department of Justice, stated:

> Senator Dirksen's bill . . . would give antitrust immunity to agreements already in effect, but would make prospective agreements unlawful, unless first approved by the Attorney General on a finding that a failing newspaper was involved. Id. at 297.

See also 116 Cong.Rec. 23146 (1970) (comments of Rep. Kastenmeier) ; id. at 23154–55 (comments of Rep. Railsback) ; id. at 23167 (comments of Rep. Edwards) ; id. at 23171 (comments of Rep. Butler). This court concludes that the legislative history does not clearly support defendant's interpretation of section 4(b) and accordingly the clear and unambiguous language of the statute must control.

## III.

■ Defendant finally asserts that the absence of any specific enforcement machinery or penalties for failure to obtain prior consent indicates that Congress did not intend that such failure would be per se illegal. Plaintiff asserts in response that the statutory language is clear and that Congress meant in section 4(b) that failure to obtain consent would be unlawful under the antitrust laws and hence that the enforcement procedures of those laws apply. This court finds it unnecessary to resolve the question of precisely how enforcement of the prior consent provision might be obtained. It is sufficient that the lack of specific enforcement machinery does not militate against the court's previous conclusions that a literal read-

---

been brought to the court's attention—it is consistent with the Act to require Attorney General consent. In granting the exemption to the 22 existing arrangements, Congress also sought to make certain that only particular agreements in the future would obtain approval. If the arrangement does not obtain consent (as for example where neither paper is failing), Congress' clear language was that such an agreement

not be put into effect. This is consistent with the Act's policy of allowing arrangements only where such are necessary to preserve a failing newspaper. See 15 U.S.C. § 1801. Where such a purpose for an arrangement does not exist, Congress, very consistently with strict enforcement of the antitrust laws, has decided that such arrangements shall be banned.

ing of section 4(b) is not against reasonable Congressional purpose or intent and does not lead to futile or absurd results. Congress authorized the Justice Department to issue regulations regarding the procedure for obtaining prior consent. H.R.Rep. 91-1193, at 11, U.S. Code Cong. & Admin.News 1970, p. 3547. When those regulations are issued and a violation thereof is encountered, a court then can consider what enforcement procedures are proper.

### Conclusion

This court finds that according to the clear and unambiguous language of section 4(b), all joint newspaper operating arrangements not in effect on July 24, 1970, must obtain the Attorney General's consent before they may be put into effect. The court is unpersuaded that there is a clear contrary legislative intention such that this court would be justified in deviating from the plain meaning of the statute. Plaintiffs, therefore, are entitled to a declaratory judgment that the Justice Department's interpretation is contrary to the law and to an injunction prohibiting the Justice Department from implementing that erroneous interpretation.

### ON MOTION FOR REHEARING

On July 23, 1974, the court granted plaintiff's motion for summary judgment, declaring that 28 C.F.R. § 48.1 (1974) was an erroneous interpretation of the Newspaper Preservation Act and enjoining implementation of that regulation. In its Memorandum Opinion the court stated "that these arrangements [joint newspaper operating arrangements] are and will be entered into by competing daily newspapers. . . . " Memorandum Opinion at 51. Defendant has petitioned the court to reconsider its earlier judgment, asserting that the above statement is inaccurate and that the inaccuracy was a substantial factor in the court's decision to rule for plaintiff.

In answer, the court first corrects defendant and explains that the quoted statement did not contribute substantially to the court's decision but arose mainly because of defendant's failure to respond to the court's questions. *See* note 2 *infra*.[1] Rather, the court's reasoning rested predominantly upon the clear and unambiguous language of the statute and the evidence in legislative history that Congress, in return for grant of a limited antitrust exemption, sought to limit future joint newspaper operating arrangements unless prior approval was obtained in conformance with the strict requirements of the Act. Under the authorities cited in the court's earlier opinion and given the complete absence of contrary legislative intent, the court feels obligated to give the statute its literal and obvious interpretation.

Defendant now has submitted an affidavit and documents which purport to show that there are some joint newspaper operating arrangements between noncompeting newspapers which would be illegal under the court's earlier ruling. This evidence was not submitted to the court for consideration on the motion for summary judgment.[2] However, even when considering such evidence, the result remains the same. The statutory language and lack of contrary legislative intent militate against defendant's interpretation. If, as defendant contends, this interpretation is not what Congress meant, then the proper course for defendant is to seek Congressional clarification or amendment. Further, there is no showing by defendant how many of the multiple use printing plants cited by defendant are actually joint newspaper operating arrangements within the Act's definition,[3] and the evidence defendant

---

1. Indeed, the cited statement constituted only one paragraph of the court's opinion.

2. Defendant, although not submitting evidence earlier, argued that such noncompeting joint newspaper operating arrangements did exist. The court dismissed that contention when, in answer to the court's query for some examples, defendant could not cite a single ex-

ample. Further, as plaintiff points out, such evidence as defendant now submits was not before Congress when the Act was enacted and thus probably should not be considered by the court in interpreting the Act.

3. *See* 15 U.S.C. § 1802(2). For example, if two papers use an independent printing establishment with no arrangement between

submits in no way indicates how many of these multiple use printing plants involve noncompeting newspapers. Finally, in the Department of Justice's regulation there was no delineation between competing and noncompeting newspaper arrangements.[4] Under the Department's regulation, any joint newspaper operating arrangement, even those between competing papers, could be put into effect without prior approval. Section 4(b) of the Act evinces a Congressional concern that prior to any such arrangements, permission be sought and obtained. At least in part this was due to Congress' desire to avoid the disruptive effect of later invalidation. *See* Memorandum Opinion at 51. Given this Congressional concern, it is perfectly logical for Congress to have required permissible joint newspaper operating arrangements to meet the Act's strict definition and obtain prior Attorney General approval.

Ordered that defendant's motion for rehearing be and the same hereby is denied.

the papers, then no joint newspaper operating arrangment would appear to have been established.

4. In passing the court notes that in this motion for rehearing the Department of Justice contests as erroneous only the court's statement that such arrangements are not entered into by noncompeting newspapers. By inference, although not admitted by defendant, it thus appears that defendant accepts that such arrangements between competing newspapers would violate the Act absent compliance with section 4(b).