**The NEWSPAPER GUILD**

v.

**Edward H. LEVI, Attorney General, Appellant.**

**No. 75–1014.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1975.

Decided July 1, 1976.

Rehearing Denied Aug. 19, 1976.

with in a conscientious manner in passing on the merits." *Davis v. Clark,* 131 U.S.App.D.C.

Barry Grossman, Washington, D.C., with whom Howard E. Shapiro and Samuel R. Simon, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

Victor H. Kramer, Washington, D.C., with whom Richard B. Wolf, Washington, D.C., was on the brief, for appellee.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

Dissenting opinion filed by Circuit Judge TAMM.

McGOWAN, Circuit Judge:

This case presents a narrow, albeit important, issue of statutory construction: Does section 4(b) of the Newspaper Preservation Act of 1970 make it unlawful to enter a joint newspaper operating agreement without the prior approval of the Attorney General, or does it rather require prior approval only for parties seeking an antitrust exemption for such an agreement? The District

379, 404 F.2d 1356, 1358 (1968) (separate opinion).

Court enjoined a Justice Department regulation implementing the latter interpretation. For the reasons set forth below, we reverse.

I

The Newspaper Preservation Act of 1970, 15 U.S.C. §§ 1801–04 (1970), was a congressional reaction against a successful antitrust suit brought by the Department of Justice against a combination of Tucson newspapers in existence since 1940. *See Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). Bills were promptly introduced in both houses of the 90th Congress to protect the Tucson publications and twenty-one other then-existing joint newspaper operating agreements from antitrust prosecution and private liability. H.R. 19123 was referred to the House Antitrust Subcommittee, which held five days of hearings; the bill, however, was not reported out of committee. A similar Senate Bill, S. 1312, was favorably reported by the Senate Subcommittee on Antitrust and Monopoly after extensive hearings, but the Judiciary Committee did not have time to act on it before the end of that session.

At the beginning of the first session of the Ninety-first Congress, bills were again introduced in both the House and Senate to sanction the Tucson combination and to insulate other existing joint operating agreements from antitrust prosecution. Both S. 1520 and H.R. 279 contained the same provisions considered by prior congressional committees reviewing S. 1312 and H.R. 19123. Among other objectives, the proposed bills declared a public interest in preserving the publication of newspapers where economic distress has caused the creation of joint operating arrangements. The proposals also defined a failing newspaper

more broadly than had the Supreme Court in *Citizen Publishing.*[1]

Section 4 provided:

(a) It shall not be unlawful under any antitrust law for any person to propose, enter into, perform, enforce, renew, or amend any joint newspaper operating arrangement if, at the time at which such arrangement is or was first entered into, not more than one of the newspaper publications involved in the performance of such arrangement was a publication other than a failing newspaper.

(b) Nothing contained in this Act shall be construed to exempt from any antitrust law any predatory pricing, any predatory practice, or any other conduct in the otherwise lawful operations of a joint newspaper operating arrangement which would be unlawful under any antitrust law if engaged in by a single entity. Except as provided in this Act, no joint newspaper operating arrangement or any party thereto shall be exempt from any antitrust law.

At the start of the Senate hearings on S. 1520, Senators Dirksen and Brooke proffered a number of amendments for consideration. Senator Dirksen's amendment changed section 4 to include, *inter alia,* the language which eventually became the section at issue in this suit:

(b) It shall be unlawful for any person to propose, enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the performance of such an arrangement was a publication other than a failing newspa-

The term "failing newspaper" means a newspaper publication which, regardless of its ownership or affiliations, is in probable danger of financial failure.
15 U.S.C. § 1802(5) (1970).

1. The Supreme Court applied a failing company test which required that no other possible buyer existed for the failing company except the one with which the arrangement was completed, and that prospects of reorganization under the Bankruptcy Act were dim or nonexistent. 394 U.S. at 138, 89 S.Ct. 927. In contrast the Act provides:

per; Provided, however, that any publisher may, at any time, propose, enter into, perform, or enforce an agreement with any person if such agreement was not prohibited by law prior to the effective date of this Act.

*Hearings on S. 1520 Before the Subcomm. on Antitrust and Monopoly of the Senate Judiciary Comm.*, 91st Cong., 1st Sess. 4 (1969) ["*Senate Hearings*"]. On January 30, 1970, the Senate passed S. 1520 including the Dirksen amendment, 116 Cong.Rec. 2018 (1970).

Subsequently, the House Judiciary Committee favorably reported H.R. 279, as amended. H.R.Rep. No. 91–1193, 91st Cong., 2d Sess. (1970). The reported bill contained substantially the language of the Dirksen amendment to section 4,[2] except that it omitted without comment the final proviso of section 4(b). H.R. 279, as amended, was accepted by the House in lieu of S. 1520, 116 Cong.Rec. 23180 (1970), and promptly adopted by the Senate without conference, *id.* at 24435.

More than one year after passage of the Act, the Department of Justice gave notice of a proposed rulemaking concerning the Act. 36 Fed.Reg. 20435 (1971). Along with definitions and procedures for filing both the terms of new arrangements and those of renewals or amendments to existing arrangements, the proposed rulemaking included a purpose section which specified in relevant part:

> These regulations set forth the procedure by which application may be made to the Attorney General for his approval of joint newspaper operating arrangements entered into after July 24, 1970.
> . . .

*Id.,* § 48.1. A few weeks later, the Department of Justice gave notice of an addition to the proposed purpose section:

> The Newspaper Preservation Act does not require that all joint newspaper operating arrangements obtain the prior written consent of the Attorney General. The Act and these regulations provide a method for newspapers to obtain the benefit of a limited exemption from the antitrust laws if they desire to do so. Joint newspaper operating arrangements that are put into effect without the prior written consent of the Attorney General remain fully subject to the antitrust laws.

*Id.* at 23630, § 48.1. The proposed regulation, including the addition, was promulgated as an interim regulation on January 2, 1974. 39 Fed.Reg. 7 (1974).

The Newspaper Guild filed suit shortly thereafter alleging that the regulation contravened section 4(b) of the Act. On motions for dismissal and summary judgment, the District Court declared the challenged regulation invalid and enjoined its implementation. *Newspaper Guild v. Saxbe,* 381 F.Supp. 48, 53 (D.D.C.1974).[3] The Department of Justice appeals from that final order.

## II

A rigidly literal reading of section 4(b) undeniably provides support for the District Court's conclusion that "all joint newspaper operating arrangements not in effect on July 24, 1970, must obtain the Attorney General's consent before they may be put into effect." 381 F.Supp. at 53. But, as the Supreme Court has frequently reminded us, "it [is] fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that

---

**2.** The House Committee bill also limited the section 4(a) exemption for existing joint operating arrangements by requiring terms of a renewal or amendment to be filed with the Department of Justice. This language, along with an additional floor amendment clarifying that arrangement amendments may not add additional newspapers to the joint operation, appears in the Act as adopted.

**3.** The Government asked the District Court to reconsider its decision and pointed out that, contrary to language in the trial court opinion, all operating arrangements were not entered into by competing newspapers. *See* page —— of 176 U.S.App.D.C., page 759 of 539 F.2d *infra.* The court denied this motion and reaffirmed its reliance on the plain language and legislative history of section 4(b). 381 F.Supp. at 53–54.

in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.'" *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962), quoting *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285, 76 S.Ct. 349, 100 L.Ed. 309 (1956) (footnotes omitted); *see e. g., Harrison v. Northern Trust Co.,* 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407 (1943). After reviewing the Act in that spirit, we cannot agree that the District Court's interpretation of section 4(b) is compelled either by the language of the statute or its underlying legislative history.

It is appropriate to start with the views of Senator Dirksen, the sponsor of the amendment that eventually became section 4(b). He explained his proposed amendment as follows:

> There has been some concern expressed regarding the possibility of new joint operating arrangements being established under the terms of S. 1520, as introduced. There are still some 36 or 37 cities where two or more papers are competing commercially as well as editorially. And, there has been a genuine fear expressed by suburban papers, newspaper unions, and some segments of the public and [sic] to the dangers inherent if some of these other papers were to improperly enter into joint operating arrangements—resulting in what might be a stronger competitive force, the loss of jobs, and, maybe, eventually a loss of independent viewpoints.
>
> This is what I had in mind in proposing Section 4(b). *Before any new joint operating arrangements could come into being, the papers involved would be required to come before the Attorney General for his approval. This is not really an unusual situation, since the Department of Justice now receives prior notice of many impending mergers by the parties, who themselves are seeking 'release' letters. I envision the procedures under section 4(b) to be akin to the 'release' letter technique now employed by the Department.* Before authorizing such arrangements in the future, the Department could hear from other interested parties—competing papers, unions, etc.—as well as make its own investigation, in order to be certain that the new arrangement is essential and is justified.
>
> Further, Section 4(b) will act as a brake upon other newspapers which might otherwise prematurely turn to joint operating arrangements, without testing other means of maintaining full commercial and editorial competition.

*Senate Hearings* at 9 (emphasis added). We think it plainly apparent from this statement that Senator Dirksen did not intend the result reached by the District Court, for declaring it unlawful to proceed without Justice Department consent does not resemble in the slightest the release letter technique employed by the Department of Justice.[4]

Even if Senator Dirksen's purposes were not already visible, further enlightenment is to be obtained from a proviso which he originally proposed as part of section 4(b): "Provided, however, that any publisher may, at any time, propose, enter into, perform, or enforce an agreement with any person if such agreement was not prohibited by law prior to the effective date of this Act." Senator Dirksen explained the thrust of that proviso: "The proviso at the end of section 4(b) is just to make sure that we have not *inadvertently* made illegal, in fact or by implication, arrangements which are

---

4. Under that release procedure, codified at 28 C.F.R. § 50.6 (1975), the Department of Justice, at the request of the parties, can state its present enforcement intention with respect to a proposed merger or acquisition. The resulting business review letter "states only the enforcement intention of the Division as of the date of the letter, and the Division remains completely free to bring whatever action or proceeding it subsequently comes to believe is required by the public interest. As to a stated present intention not to bring an enforcement action, however, the Division has never exercised its right to bring a criminal action where there has been full and true disclosure at the time of the request."

now lawful." *Senate Hearings* at 9 (emphasis added).

Senator Dirksen's position is directly contrary to the interpretation of the District Court, since under the latter's view certain arrangements that were lawful under the antitrust laws would nevertheless violate section 4(b). For example, the Attorney General would be unable to "approve" a joint operating agreement between two healthy, *non-competitive* newspapers since he is required by statute to grant approval only if he finds that no more than one of the newspapers involved is "other than a failing newspaper." 15 U.S.C. § 1803(b) (1970); *see id.* § 1802(5) (definition of failing newspaper). Consequently, under the District Court's interpretation, *it is unlawful* to enter into an otherwise lawful arrangement simply because the Attorney General did not—and indeed could not—give prior written consent.

The history of the proviso itself sheds light on the purpose of section 4(b). The initial Senate version contained the proviso, which, as we noted above, was inserted to avoid making illegal what had been lawful prior to the Newspaper Preservation Act. The proviso was dropped when the House bill was reported by the Judiciary Committee, but there is no indication in the report as to why the proviso was deleted. *See* page —— of 176 U.S.App.D.C., p. 756 of 539 F.2d *supra.* The Senate was urged by Senator Hruska, the floor manager of the bill, to adopt the House version rather than go to conference, and he specifically noted that the House "modified the two amendments somewhat and effected other amendments *which did not go the substance of the bill."* 116 Cong.Rec. 24434 (1970) (emphasis added). Based on that evidence alone, the failure to enact the proviso provides some support, however slight, for the position that section 4(b) *was not intended* to make illegal what had been lawful prior to the Act.

The dissent nevertheless concludes that "deletion of the status quo proviso points more reasonably to a broad requirement of prior approval for all future arrangements." Dissent at —— of 176 U.S.App.

D.C., at 765 of 539 F.2d. Judge Tamm reaches that conclusion based on a review of the floor discussion in the Senate concerning the House amendments, noting that both proponents and opponents of the bill recognized that the House version granted a more limited exemption than had the Senate bill. We agree that the floor discussion of the House amendments suggests the Senate's awareness that the House version "tighten[ed] the standards" with respect to whether a newspaper was "failing" and therefore eligible for the antitrust exemption. But there is nothing that indicates that the Senate thought that the House amendments made illegal what had been lawful under the Senate version. Surely if the Senate concluded that the amended House version accomplished such a major change, the issue would have been discussed directly rather than couched in terms of "tightening" the standards for availability of the exemption.

The various committee reports point in the same direction as did Senator Dirksen. We think it worth setting out in full the House Report's "analysis" of section 4(b):

> Section 4(b) applies to joint newspaper operating arrangements that come into being after enactment of the bill. *Such joint newspaper operating arrangements, to have the benefit of an exemption from the antitrust laws, must have the prior written consent of the Attorney General of the United States.* Prior to granting the approval, the Attorney General is required to determine that not more than one of the newspaper publications involved was a publication other than a "failing newspaper" as defined in the Act. The Attorney General also is required to find that approval of the arrangement would effectuate the policy and purposes of the Act. Section 4(b) contemplates that the Attorney General will promulgate such regulations as are appropriate for the discharge of these responsibilities.

H.R.Rep. No. 91–1193, 91st Cong., 2d Sess. 11 (1970), U.S.Code Cong. & Admin.News 1970, pp. 3547, 3555 (emphasis added). We

can give the House Report only one interpretation, namely, to have the benefit of an antitrust exemption, prior written consent is required; but simply to put a joint operating arrangement into effect, consent is not required, though absent approval the arrangement remains fully subject to the antitrust laws.

There is language in the Senate Report which supports the interpretation of the District Court, but when read in the context of the entire Senate Report that interpretation appears strained. In discussing the purposes of the legislation the Senate Report indicates that the bill was intended "to grant limited antitrust exemptions to past agreements . . . *and to make this method of insuring newspaper stability available to newspapers in danger of financial collapse after passage of the bill.*" S.Rep. No. 91–535, 91st Cong., 1st Sess. 2 (1969) (emphasis added). Surely it is somewhat odd to claim that Congress has made an exemption "available" by declaring it unlawful to proceed without the "exemption." The Senate Report, like the House Report, nowhere mentions the imposition of a new standard of substantive liability.

With respect to the floor debates, we need only reemphasize the point made above with respect to the committee reports and Senator Dirksen's statements. There are statements to the effect that new agreements must come before the Attorney General for approval. But such statements are consistent with the Government's interpretation of section 4(b); indeed, legislators would not normally be expected constantly to reiterate the magic words "in order to obtain an antitrust exemption" while discussing a bill directed to that very purpose. We have been unable to locate statements indicating that it is *unlawful* to proceed without the Attorney General's written consent. To the contrary, the Government's brief collects numerous citations to the floor debates indicating that the purpose of the bill was well understood—the availability of an antitrust exemption in appropriate circumstances upon voluntary application therefor.

Other factors suggest that the District Court's interpretation does not reflect the intent of Congress. For one thing, Congress provided neither civil nor criminal penalties to enforce the new substantive standard it purports to find in the statute. The dissent argues that this "does not rebut the clear directive that newspapers must obtain written consent before implementing a joint operating arrangement," Dissent at 10; if, as we think, that "directive" is far from "clear," the absence of an enforcement scheme cuts the other way.

Furthermore, as we noted earlier, many arrangements without anticompetitive impact do not qualify for Attorney General approval given the statutory standard, and that as a result the District Court's interpretation makes unlawful certain joint operating agreements that prior to the Newspaper Preservation Act were lawful within the meaning of the antitrust laws. *See* page —— of 176 U.S.App.D.C., p. 759 of 539 F.2d *supra.* We find such a result anomalous in an Act clearly designed *to create an exemption* to the antitrust laws.

This brings us to the core of our disagreement with the District Court's interpretation. That interpretation necessarily implies that Congress sought to limit joint arrangements in the newspaper industry by adding the obstacle of prior approval to those that would otherwise not be prohibited by the antitrust laws. Such a view suggests that Congress perceived a special reason to fear combinations in, or a special difficulty in applying antitrust laws to, the newspaper industry. But we have found no evidence in the record—or, for that matter, in any public debate—indicating that such concerns existed. Rather, the record reveals that the purpose of the Act was just the opposite—to permit combinations in the newspaper industry that would otherwise be prohibited by the antitrust laws. H.R. Rep. No. 91–1193, 91st Cong., 2d Sess. 3 (1970), U.S.Code Cong. & Admin.News 1970, p. 3547 (purpose of the Act is "[t]o provide a limited exemption from the antitrust laws for joint newspaper operating arrangements entered into in the future with the

prior written consent of the Attorney General . . ..").

This statute is, in Congress's own terms, "An Act to exempt from the antitrust laws certain combinations and arrangements necessary for the survival of failing newspapers," 84 Stat. 466; indeed, the very section of the Act at issue here is captioned "Antitrust exemption." *See, e. g., Lan Jen Chu v. Commissioner,* 486 F.2d 696, 700 (1st Cir. 1973) (language used in caption of statute provides at least some evidence of intended congressional scheme); *White v. Chicago, Burlington & Quincy R. R.,* 417 F.2d 941, 948 (8th Cir. 1969) (title of act can be considered in construing act). The Act was a speedy and self-proclaimed response to *Citizen Publishing Co., supra,* and, as such, was designed to help failing newspapers, not to place additional burdens on healthy ones.

Careful draftsmanship would have undoubtedly produced a provision whose language less ambiguously indicates the intended result. But the fact that Congress acted swiftly and with less than the desired degree of precision does not argue for rigid reliance upon the literal text of the statute. It rather alerts the court to the need for delving more deeply into the congressional purpose. Legislative history is a contextual rather than a purely textual tool of construction. We conclude that the interpretation of the District Court is at odds with the "object and policy" of the Congress. *See Richards v. United States, supra,* 369 U.S. at 11, 82 S.Ct. 585. The decision of the District Court is therefore reversed.

*It is so ordered.*

TAMM, Circuit Judge (dissenting):

The issue in this case is whether section 4(b) of the Newspaper Preservation Act of 1970 creates a substantive rule of law requiring *all* joint newspaper agreements entered into after 1970 to obtain prior approval of the Attorney General. The majority opinion holds instead that the Act requires approval only for those newspapers that wish to take advantage of an antitrust exemption. While I agree that Congress might have been wiser to select this method of optional approval, the statute and my reading of the legislative history convince me that this is not the choice Congress actually made.

The majority opinion concludes that the regulation promulgated by the Justice Department accurately interprets section 4(b). Although great deference is due an interpretation of a statute by the agency or department charged with its enforcement, *Red Lion Broadcasting Co., Inc. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), this deference must yield to patent disregard of the plain and unambiguous language of a statute. *See, e.g., Campbell v. Brown,* 245 F.2d 662, 666 (5th Cir. 1957); *Santiago v. Gardner,* 288 F.Supp. 156, 159 (D.P.R. 1968).

Similarly, a change in interpretation by the department, while entitled to some deference, is granted less weight than a long-standing policy dating from passage of the statute. *United States v. Healey,* 160 U.S. 136, 145, 16 S.Ct. 247, 40 L.Ed. 369 (1895); *cf. Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616, *rehearing denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965). While the challenged regulation is the first promulgated by the Attorney General in response to the Newspaper Preservation Act, the interpretation appears to conflict with the initial determination of Assistant Attorney General Richard W. McLaren, Antitrust Division, who represented the Department of Justice in the hearings before the House and Senate. Having expressed Justice's disapproval of the proposed bill, he also noted the Department's dissatisfaction with the Dirksen amendments:

Senator Dirksen's bill, as I read it would give antitrust immunity to agreements already in effect, but *would make prospective agreements unlawful, unless first approved by the Attorney General on a finding that a failing newspaper was involved.*

We oppose this bill for the same reasons that we oppose S. 1520, and for the additional reason that, as a matter of

principle, we oppose vesting regulatory authority in the Attorney General.

Whether or not particular conduct violates the law, we think, should be decided by the courts and not by a prosecutor. *Hearings on S. 1520 Before the Subcomm. on Antitrust and Monopoly of the Senate Judiciary Comm.,* 91st Cong., 1st Sess. 297 (1969) (*"Senate Hearings"*) (emphasis added). Mr. McLaren again stressed this aversion to a regulatory function for Justice in the House hearings. *Hearings on H.R. 279 and Related Bills Before the Antitrust Subcomm. of the House Comm. on the Judiciary,* 91st Cong., 1st Sess. 375 (1969) (*"House Hearings"*). Although this testimony may appear equivocal as it relates to the specific issue of whether the Department of Justice had to approve all new arrangements, it casts a pall over the interpretation given in the regulation. This is particularly true since the original proposed regulation did not limit the filing requirements to newspapers seeking antitrust immunity. *See* 36 Fed.Reg. 20435, discussed *supra.* Regardless of whether the challenged regulation represents a change of heart by a department reluctantly exercising its unwanted responsibility or a belated concern with a problem of interpretation not directly faced before, it does not come to us armed with the force of a contemporaneous interpretation of the enforcement department. Furthermore, I am particularly hesitant to accept this interpretation since it conflicts with both the language of the Act and my reading of the legislative history.

As the majority opinion points out, there is no question that the Newspaper Preservation Act was passed in an atmosphere of concern that late-blooming antitrust prosecution by the Department of Justice would unfairly penalize existing joint operating arrangements which had functioned for years without governmental disapproval and, by deterring new arrangements, would compel failing papers of the future to sell to their competitors, thus depriving metropolitan areas of the benefits of competing editorial staffs and policies. The concept of a limited newspaper exemption from antitrust law clearly pervades the Act and the history of its enactment.

Within the statute itself, this antitrust milieu is evident. "Antitrust law" is one of the major terms defined, 15 U.S.C. § 1802(1) (1970), and the legislative annulment of the holding of *Citizen Publishing* and similar cases pending on the Act's effective date refers to actions alleging antitrust law violations, *id.* at § 1804(a), (b). Even the language of section 1803 (section 4 of the Act) emphasizes this relationship. Under subsection (a), certain existing arrangements are declared not "unlawful under any antitrust law," while subsection (c) assures that the Act will not "exempt from any antitrust law any predatory pricing, any predatory practice, or any other conduct . . . which which be unlawful under any antitrust law if engaged in by a single entity."

The interpretation issue before us arises because this "unlawful *under antitrust law*" language does not appear in subsection (b). Instead, the provision states simply that "[i]t shall be unlawful" to enter into new operating arrangements without the prior consent of the Attorney General. Customary rules of statutory construction alone lend credence to the conclusion that use of the term "unlawful under antitrust laws" in all subsections except (b) evidences Congressional intent to distinguish a new type of violation. The legislative history, moreover, convinces me that the broad language employed in section 1803(b) means exactly what it says: [1] *all new joint operating ar-*

---

1. This circuit has rejected a plain meaning rule which forbids consideration of legislative history when the language of the statute is clear and unambiguous. *See, e.g., March v. United States,* 165 U.S.App.D.C. 267, 506 F.2d 1306, 1313–15 (1974). *See also* Murphy, *Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts,* 75 Colum.L.Rev. 1299 (1975). As Justice Felix Frankfurter once stated, "In the end, language and external aids, each accorded the authority deserved in the circumstances, must be weighed in the balance of judicial judgment." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 544 (1947). *See also Train v. Colorado Public Interest Research Group,* —— U.S. ——, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976).

*rangements which do not receive prior approval are illegal, regardless of whether they would otherwise violate antitrust laws.*

The history of the bill reveals a compromise measure aimed at protecting labor and financially competing papers as well as preserving editorial competition. Senator Dirksen, in explaining his proposed amendment to section 4 of the Act, stated:

> *Sec.* 4(b) is a new section which provides that *any* future joint operating arrangements must have prior Justice Department consent. In this way, the interest of the suburban papers and the unions will be considered by the Justice Department before any new arrangements are authorized.
>
> These two new subsections 4(a) and (b) provide a reasonable compromise for all of the parties involved. The equities of the present situation in the 22 joint operating cities will be maintained; the suburban newspapers and unions will be protected in the future; and a broad exception to the antitrust laws has been avoided.

*Senate Hearings* at 5 (emphasis added). He later expanded upon this compromise theme:

> The new language is designed to offer a means of protection to the small suburban and weekly newspapers, and to newspaper employees and their unions, while preserving the separate editorial voices now flourishing in the 22 cities with joint operating arrangements. It offers a compromise solution which should meet the immediate needs of all involved: those papers now in joint operating arrangements, newspapers which may some day have to turn to joint operations as their only chance for survival; suburban newspapers which compete with the metropolitan papers for advertising revenue; workers who are employed by newspapers; and most significantly, the public interest.
>
> .   .   .   .   .   .

There has been some concern expressed regarding the possibility of new joint operating arrangements being established under the terms of S. 1520, as introduced. There are still some 36 or 37 cities where two or more papers are competing commercially as well as editorially. And, there has been a genuine fear expressed by suburban papers, newspaper unions, and some segments of the public and [*sic*] to the dangers inherent if some of these other papers were to improperly enter into joint operating arrangements—resulting in what might be a stronger competitive force, the loss of jobs, and, maybe, eventually a loss of independent viewpoints.

> This is what I had in mind in proposing Section 4(b). *Before any new joint operating arrangements could come into being, the papers involved would be required to come before the Attorney General for his approval.* . . . Before authorizing such arrangements in the future, the Department could hear from other interested parties—competing papers, unions, etc.—as well as make its own investigation, in order to be certain that the new arrangement is essential and is justified.
>
> Further, Section 4(b) will act as a brake upon other newspapers which might otherwise prematurely turn to joint operating arrangements, without testing other means of maintaining full commercial and editorial competition.

*Id.* at 8–9 (emphasis added). *See also* Remarks of Senator Hruska, 116 Cong.Rec. 2005–06 (1970).

As sponsor of the amendment and a strong supporter of the bill, Senator Dirksen was well aware of the competing interests that would be affected by the proposed legislation. Both the Department of Justice and the Federal Trade Commission were strongly opposed to further fragmentation of the antitrust laws. *See Senate Hearings* at 294–312; *House Hearings* at 357–403, 475–96. In addition, the American Bar Association adopted a resolution echo-

ing this opposition. 116 Cong.Rec. 23143 (1970). While a few local unions associated with existing joint operating arrangements supported the bill, the American Newspaper Guild, the AFL–CIO, the International Typographical Union, the New England Press Association and others in the newspaper industry registered strong disapproval. *Compare House Hearings* at 19, 42–43, 56–67, 404–13, 427–28; *with Senate Hearings* at 238–49, 287–90. *See also House Hearings* at 414–20, 427; 116 Cong.Rec. 23175 (1970). Both newspapers and publishing employees expressed fear that allowing future arrangements would be unduly anticompetitive and would cause loss of jobs. The New England Press Association claimed that the legislation was "designed to prevent this natural change from central city dailies to strong suburban newspapers" and would "do great damage to individual newspaper owners." *House Hearings* at 427. William Loeb, publisher of the *Manchester Union Leader,* cautioned the committee that

> [t]here are thousands of weekly papers throughout the whole United States, and small newspapers, from which [Committee members] have not heard, who are violently opposed to this legislation. Unfortunately they have neither the means nor the association to bring so effectively to bear their views as have the larger newspapers, BUT—and this is the important thing to remember—their total readership is very large indeed.

*House Hearings* at 510. The Newspaper Guild claimed loss of jobs while the International Typographical Union recounted horror stories of the labor problems encountered under existing arrangements. *Senate Hearings* at 239, 289–90. These problems had been articulated in greater detail in the 1967–68 hearings on prior newspaper preservation bills. *See, e.g. Hearings on H.R.*

*19123 and Related Bills Before the Antitrust Subcomm. of the House Comm. on the Judiciary,* 90th Cong., 2d Sess., ser. 25, at 357–64, 367–422 (1968); *Hearings on S. 1312 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary,* 90th Cong., 1st Sess., pt. 1, at 105–72; pt. 2, at 1022–34; pt. 6, at 2545–68, 2615–23, 2625–52, 2673–97. The Dirksen amendment to section 4 was a clear response to these concerns.

The majority opinion relies heavily on the proviso to the Dirksen amendment which maintained the legal status of joint activities not illegal under antitrust laws existing at that time. Even if this provision would have militated against the absolute requirement of prior approval suggested in the remainder of section 4(b),[2] it was rejected by the House and, upon reconsideration, by the Senate. The House Judiciary Committee favorably reported the bill in the form in which section 4(b) now appears. No indication in the report explains why the Dirksen amendment was only partially accepted. Senator Hruska, floor manager for the bill upon its return from the House, urged adopting of the House version without having to go to conference. As for the changes, he stated only:

> The other body, just last week, *modified the two amendments somewhat* and effected other amendments which did not go to the substance of the bill.

116 Cong.Rec. 24434 (1970) (emphasis added). While the statement intimates that the House amendments were minor, both supporters and opponents of the bill recognized the major substantive changes created by the House. One alteration minimally acknowledged by Senator Hruska was the fact that the House bill created a far more limited exemption than had the Senate version.[3] Since this substantial change was brushed off lightly by Senator Hruska, re-

---

**2.** It is conceivable that this proviso might have been intended to expand the Attorney General's power to approve arrangements not conflicting with general antitrust principles rather than to limit the types of arrangements which must obtain approval.

**3.** The House Committee bill also limited the section 4(a) exemption for existing joint operat-

ing arrangements by requiring terms of a renewal or amendment to be filed with the Department of Justice. This language, along with an additional floor amendment clarifying that arrangement amendments may not add additional newspapers to the joint operation, appears in the Act as adopted.

liance on his statement that the Dirksen amendment had been modified "somewhat" seems risky. I would agree rather with the thoughtful evaluation by the district court that deliberate deletion of the status quo proviso points more reasonably to a broad requirement of prior approval for all future arrangements. This seems particularly true since, in spite of vociferous arguments that final settlement in the Tucson case proved that current antitrust law allowed most, if not all, of the joint operating arrangements needed for failing papers, proponents of the bill still insisted upon the exemptions provided in section 4. *See, e. g.,* 116 Cong.Rec. 1802–03 (1970). In order to maintain these exemptions, I believe, proponents accepted further limitations in section 4(a) and strengthened the prior approval of section 4(b) to assuage the fears of those who opposed the bill. Excerpts from the House debate illustrate the quid pro quo nature of section 4(b).

> Mr. McCulloch. . . . In addition, the prospective application of this exception now is carefully circumscribed by requiring the consent of the Attorney General for any future joint newspaper arrangements.

116 Cong.Rec. 23148 (1970).

> Mr. Railsback. . . . Recognizing the historic inactivity on the part of the enforcement agencies and the reliance upon such inactivity by various newspapers in effecting the currently existing joint newspaper operating arrangements, the bill provides a relatively more liberal standard for determining whether the antitrust exemption applies to such arrangements. Nevertheless, prospective availability of the exemption has been sharply restricted by requiring the consent of the Attorney General for any future joint arrangement. . . .

*Id.* at 23154. *See also* remarks of opponent Mr. Edwards of California:

> The [House] Judiciary Committee did improve the Senate-passed version by making it more difficult for new joint agreements providing for profit sharing

and price fixing to come into existence. Any new agreements must be approved in advance by the Attorney General. . . .

*Id.* at 23167. I believe that, in this compromise setting, the House deletion of the proviso reflects a desire to protect even more completely the labor groups and suburban newspapers whose interests had sparked Senator Dirksen's amendment.

The majority also argues that if Congress had intended a new standard of liability for all future joint operating arrangements it would have provided civil or criminal penalties, whereas the Newspaper Preservation Act has no penalty section. Although I readily agree that this omission may indicate a lack of thorough planning by Congress, it does not rebut the clear directive that newspapers must obtain written consent before implementing a joint operating arrangement. The Act, applying as it does to federal antitrust law, may have created a new specific antitrust violation subject to the penalty and enforcement provisions of the Federal Trade Commission Act, the Sherman Anti-Trust Act, and the Clayton Act. See, *e.g.,* 15 U.S.C. §§ 3–4, 15–15a, 21, 25, 26 (1970); §§ 1–2, 45, 50, *as amended* (Supp. IV 1974). The violation may form the basis for implying a right for the Attorney General to seek injunctive relief. Perhaps civil remedies, as suggested by appellee, Appellee's Br. at 18, are appropriate. As the trial court properly noted, this suit challenging the interim regulation does not present the issue of what, if any, remedy is to be applied. 381 F.Supp. at 52–53. If and when that question arises, the court will be able to apply the recent guidelines of the Supreme Court as to implied remedies. *See, e.g., Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *National Railroad Passenger Corp. v. National Association of Railroad Passengers ("Amtrak"),* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646, *rehearing denied,* 415 U.S. 952, 94 S.Ct. 1478, 39 L.Ed.2d 568 (1974); *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *See also* Comment, *Pri-*

vate *Rights of Action Under* Amtrak *and* Ash: *Some Implications for Implication,* 123 U.Pa.L.Rev. 1392 (1975); Comment, *The Phenomenon of Implied Private Actions Under Federal Statutes: Judicial Insight, Legislative Oversight or Legislation by the Judiciary?*, 43 Fordham L.Rev. 441 (1974). I observe only that when Congress has in the past declared conduct illegal without prescribing a remedy, the courts have shown themselves capable of fashioning enforcement procedures to carry out the legislative scheme. *See, e.g., Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 238, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 414 n. 13, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (implying equitable remedy from 42 U.S.C. § 1982 (1970) which guarantees to all citizens the right "enjoyed by white citizens" to own or dispose of property).[4] There is no reason to believe that the judiciary would be unable to apply this same skill in carrying out the dual policies of the Newspaper Preservation Act.

The majority opinion also points out that the Act's very broad definition of a joint operating agreement[5] covers many arrangements which would not have been illegal under prior antitrust laws, *e.g.,* using joint production facilities without fixing advertising or circulation rates. The standard by which the Attorney General must gauge arrangements submitted for his approval is stringent: he must "determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter." 15 U.S.C. § 1803(b) (1970). The Justice Department argues that since many non-anticompetitive arrangements could not be approved under this test, Congress could not possibly have intended this result.

The compromise measure selected by the legislature is an acknowledged deviation from basic antitrust principles. It is not unthinkable that, just as Congress exempted certain newspaper profit pooling and price fixing arrangements from the antitrust laws, it also subjected the industry to more stringent requirements for any cooperative ventures. As pointed out frequently during discussion of the bill, Congress had already carved out special antitrust rules for banks, agricultural cooperatives, and professional sports. *See, e.g.,* 116 Cong.Rec. 1789 (1970).

Of course, it is equally possible that in subjecting all arrangements to approval, thus protecting unions and other newspapers from adverse results, Congress simply failed to protect another interest which, if considered under less pressing time strictures, it might decide to foster. Our function in interpreting the statute, however, is not to second guess what Congress would decide today if this problem of the industry were presented for legislative resolution.

---

**4.** We note also the many instances where courts have fashioned private remedies from regulatory legislation prescribing only governmental enforcement. *See, e.g., J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (private right of action under section 14(a) of the Securities Exchange Act of 1934); *Fitzgerald v. Pan American World Airways, Inc.,* 229 F.2d 499 (2d Cir. 1956) (private remedy for passenger racially discriminated against in violation of section 404(b) of the Civil Aeronautics Act). These cases would be particularly relevant if a later court should determine that section 1803(b) creates a special antitrust violation under the general antitrust laws.

**5.** (2) The term "joint newspaper operating arrangement" means any contract, agreement, joint venture (whether or not incorporated), or other arrangement entered into by two or more newspaper owners for the publication of two or more newspaper publications, pursuant to which joint or common production facilities are established or operated and joint or unified action is taken or agreed to be taken with respect to any one or more of the following: printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; establishment of circulation rates and revenue distribution: *Provided,* That there is no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined.

15 U.S.C. § 1802(2) (1970).

Cardozo put it this way: "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take this statute as we find it." . . . An omission at the time of enactment, whether careless or calculated, cannot be judicially supplied however much later wisdom may recommend the inclusion." Frankfurter, *supra* note 1, at 534. The court must interpret the Act according to its terms and its history, relying on Congress to remedy legislation that is overinclusive or under-reflective.

In passing the Newspaper Preservation Act, Congress attempted to balance the competing interests of what it perceived as a threatened newspaper industry against the dangers of anticompetitive practices. The highly controversial bill, opposed by national unions and organizations of suburban newspapers, was amended numerous times to allay the fears of its opponents that a few newspapers would be benefited at the expense of the entire industry. The prior approval concept, presented first in the Dirksen amendment, introduced an element of governmental supervision to limit the use of future arrangements. Congress may not have considered all the ramifications of imposing this requirement on every future agreement regardless of its compliance with other antitrust laws, and legislators eager to prevent private litigation against existing arrangements may have failed to provide adequately for enforcement of the compromise measure. These unfortunate possibilities, however, do not change the fact that Congress appears to have selected a scheme wherein all agreements would be subject to prior approval. I must conclude with the district court that the expansive language of section 4(b), "whether careless or calculated," is clear and supported by legislative history. For these reasons I respectfully dissent.